1  LAWRENCE A. ORGAN (SBN 175503)
2  JULIANNE K. SCHWARZ (SBN 290001)
   NICOLE C. MOSKOWITZ (SBN 298431)
3  **CALIFORNIA CIVIL RIGHTS LAW GROUP**
   407 San Anselmo Avenue, Suite 201
4  San Anselmo, CA 94960
5  Telephone:    (415) 453-4740
   Facsimile:    (415) 785-7352
6  larry@civilrightsca.com

7

8

9

10                **UNITED STATES DISTRICT COURT**

11              **NORTHERN DISTRICT OF CALIFORNIA**

12

13  JOHN ADAMS, SHANE CASTLE on            Case No.:  15-cv-01046-YGR
    behalf of themselves and all others
14  similarly situated,                    **PLAINTIFFS CONSOLIDATED**
                                           **OPPOSITION TO DEFENDANTS**
15              Plaintiffs,                **CATTERSON'S AND**
                                           **COMMITTEE ON JUDICIAL**
16         v.                              **CONDUCT AND DISABLITY'S**
                                           **MOTIONS TO DISMISS**
17  COMMITTEE ON JUDICIAL
    CONDUCT AND DISABILITY OF
18  THE JUDICIAL CONFERENCE OF
    THE UNITED STATES; and CATHY          Hearing Date:  July 28, 2015
19  A. CATTERSON in her official          Time:  2:00 p.m.
    capacity as Circuit and Court of      Courtroom 1, 4th Floor
20  Appeals Executive to the U.S. Courts
    for the Ninth Circuit.
21              Defendants.               Hon. Yvonne Gonzalez Rogers

22  _____

23

24

25

26

27

28

# Contents

I.   INTRODUCTION ................................................................................................................ - 1 -

II.   STATEMENT OF FACTS ................................................................................................... - 1 -

III.   LEGAL ARGUMENT ......................................................................................................... - 2 -

   A.   This Court Has Jurisdiction to Hear the Instant Case ................................................. - 2 -

      1.   The Government Waived Sovereign Immunity with Respect to Requests for Documents Under FOIA ................................................................................................................................. - 2 -

      2.   The Court's Inherent Authority to Engage in Judicial Review of Unconstitutional Laws  Gives the Court Power to Declare the Judicial Exemption Unconstitutional ................................. - 3 -

      3.   The JCD Committee Is Not Immune from Suit Because It Was Not Acting in a Judicial Role When it Rejected Plaintiffs' Request for the Emails and the Doctrine of Judicial Immunity Does Not Apply to the Facts Here .............................................................................................................. - 4 -

      4.   Catterson Is Not Immune in Her Official Capacity for Unconstitutional Acts or Acts That Are Not Judicial Acts But Ministerial ................................................................................................ - 5 -

      5.   Plaintiffs' Injury Flows Directly from Catterson's Denial of Access to the Racist and Sexist Emails and Therefore They Have Standing ................................................................................ - 7 -

   B.   Plaintiffs Have a First Amendment Right to the Racist and Sexist Emails ........................... - 7 -

      1.   The Freedom of the Press Is Broad ............................................................................ - 8 -

      2.   The Press, in Exercising Its' First Amendment Rights, Provides an Important Check on the Judiciary ........................................................................................................................... - 9 -

      3.   The First Amendment Prohibits Prior Restraints Against the Press ............................ - 10 -

      4.   Denying Access to Judge Cebull's Racist, Sexist Emails Constitutes a Prior Restraint ....... - 10 -

      5.   Defendants' Read *Houchins* and Similar Cases Too Broadly ...................................... - 11 -

      6.   Judge Cebull's Act of Sending Racist Emails Is Not a Judicial Act ............................... - 12 -

      7.   Shielding the Facts of Judge Cebull's Racist and Sexist Emails Would Contravene Notions of Due Process and an Unbiased Judiciary and Do Not Serve a Compelling Government Interest ................ - 13 -

   C.   FOIA Provides a Basis for Obtaining Judge Cebull's Racist and Sexist Emails ..................... - 13 -

      1.   FOIA Provides a Legal Basis for Obtaining Records from Government Agencies ................... - 13 -

      2.   Plaintiff's Complaint Specifically Contends that the FOIA Exemption for the Judiciary Is Unconstitutional and Therefore Defendants' Reliance on the Judicial Exemption to FOIA as the Basis for Denying Access to Judge Cebull's Emails Was also Unconstitutional ................................. - 14 -

   D.   The Judicial Conduct and Disability Act Does Not Protect Emails Created Before the Investigation Started from Disclosure .................................................................................................. - 16 -

   E.   Plaintiffs Have a Common Law and Constitutional Right to Access Official Public Records of the United States District Court ....................................................................................... - 17 -

IV.   CONCLUSION ................................................................................................................ - 19 -

## Cases

*Al-Nashiri v. MacDonald*, 741 F.3d 1002, 1008 (9th Cir. 2013)................................................ - 7 -

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436-437 (1993) .......................................... - 7 -

*Associated Press v. U.S. Department of State* (Case No. 15-cv-345) (D.D.C. March 11, 2015) .......................... - 15 -

Bridges v. California, *314 U.S. 252, 289, 62 S.Ct. 190, 206, (1941)*........................................... - 10 -

*Burns v. Reed*, 500 U.S. 478, 486-487 (1991) ...................................................................... - 7 -

Cox Broadcasting Corp. v. Cohn, *420 U.S. 469, 491-496 (1975)* ............................................... - 19 -

*De Jonge v. State of Oregon*, 299 U.S. 353, 364, 57 S. Ct. 255, 260, (1937) ................................ - 9 -

*Department of Air Force v. Rose*, 425 U.S. 352, 361 (1976). .................................................. - 15 -

*Department of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 772 (1989)........... - 15 -

*Department of Justice v. Tax Analysts*, 492 U.S. 136, 148, 150 (1989) ..................................... - 15 -

Diversified Industries Inc. v Meredith., *572 F. 2d 596, 611 (8th Cir. 1977)*................................... - 17 -

*Doe v. Qi*, 349 F. Supp. 2d 1258, 1286 (N.D. Cal. 2004) ....................................................... - 8 -

Estes v. Texas, *381 U.S. 532, 542 (1965)*........................................................................ - 20 -

Ex parte Drawbaugh, *2 App.D.C. 404 (1984)* .................................................................... - 19 -

*Ex Parte Young*, 209 U.S. 123, 159 (1908) ...................................................................... - 8 -

*Fagan v. State Board of Assessors*, 80 N.J.L. 516, 77 A. 1023 (1910) ..................................... - 18 -

Forrester v. White, *484 U.S. 219, 230, 108 S. Ct. 538, 545-46, (1988)*..............................- 13 -, - 14 -

Freedom to Travel Campaign v. Newcomb, *82 F.3d 1431, 1441 (9th Cir. 1996)* ......................... - 13 -

*Grosjean v. Am. Press Co*., 297 U.S. 233, 250, 56 S. Ct. 444, 449, (1936) ............................... - 9 -

*GTE Sylvania, Inc. v. Consumers Union of United States, Inc.*, 445 U.S. 375, 385 (1980) ............... - 15 -

Houchins v. KQED, Inc., *438 U.S. 1, 15 (1978)* .................................................................. - 12 -

Hunt v. Blackburn, *128 U. S. 464, 470 (1888)* ................................................................... - 17 -

In re Judicial Misconduct, *751 F.3d 611, 623 (U.S. Jud. Conf. 2014)* ...................................... - 18 -

Landmark Communications, Inc. v. Virginia, *435 U.S. 829, 839, 98 S. Ct. 1535, 1541 (1978)* .......... - 10 -

*Larson v. Domestic & Foreign Commerce Corp*., 337 U.S. 682, 689-90 (1949)............................... - 7 -

*Malley v. Briggs*, 475 U.S. 335, 342 (1986)....................................................................... - 7 -

Marbury v. Madison, *5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803)*.............................................. - 4 -

Mullis v. U.S. Bankr. Court, *828 F.2d 1385, 1388 (9th Cir. 1987)*............................................. - 5 -

Nat'l Fed'n of Indep. Bus. v. Sebelius, *132 S. Ct. 2566, 2579, 183 L. Ed. 2d 450 (2012)* ............... - 4 -

*Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 718, 51 S. Ct. 625, 631-32 (1931) .............. - 9 -

Near v. State of Minnesota ex rel. Olson, *283 U.S. 697, 720, 51 S. Ct. 625, 632 (1931)*................ - 11 -

Nebraska Press Ass'n v. Stuart, *427 U.S. 539, 556, 96 S. Ct. 2791, 2801 (1976)*......................... - 11 -

*New York Times Co. v. Sullivan*, 376 U.S. 254, 272-73, 84 S. Ct. 710, 722 (1964).......................... - 10 -

*New York Times Co. v. United States*, 403 U.S. 713, 717, 91 S. Ct. 2140, 2143 (1971)................- 9 -, - 11 -

*Nowack v. Fuller*, 243 Mich. 200, 219 N.W. 749, 750 (1928). ............................................... - 18 -

*Payne v. Staunton*, 55 W.Va. 202, 46 S.E. 927 (1904).......................................................... - 18 -

*Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390, 89 S. Ct. 1794, 1807, 23 L. Ed. 2d 371 (1969) ....... - 16 -

*Republican Party of Minn. v. White (White I)*, 536 U.S. 765, 774 (2002)................................... - 16 -

Rex v. Babb, *3 Term R. 579* ....................................................................................... - 19 -

Rex v. Shelley, *3 Term R. 141*...................................................................................... - 19 -

Sheppard v. Maxwell, *384 U.S. 333, 350, 86 S. Ct. 1507, 1515 (1966)*....................................... - 10 -

*State ex rel. Colescott v. King*, 154 Ind. 621, 57 N.E. 535 (1900) .......................................... - 19 -

*State ex rel. Wellford v. Williams*, 110 Tenn. 549, 75 S.W. 948 (1903); *Clement v. Graham*, 78 Vt. 290, 63 A. 146
     (1906) ....................................................................................................... - 18 -

*Stump v. Sparkman*, 435 U.S. 349, 362, 98 S. Ct. 1099, 1107, (1978)....................................- 6 -, - 7 -

Supreme Court of Virginia v. Consumers Union of United States, Inc., *446 U.S. 719, 100 S.Ct. 1967, (1980)*.... - 14 -

Trammel v. United States, *445 U. S. 40, 51 (1980)*............................................................. - 17 -

## Statutes

28 U.S.C. § 360(a)................................................................................................. - 7 -

*28 U.S.C. § 457* ................................................................................................... - 19 -

*28 U.S.C. § 753(b)*,............................................................................................... - 19 -

*5 U.S.C. § 551(1)(B)*.......................................................................................- 3 -, - 16 -

*5 U.S.C. § 552(a)*................................................................................................ - 15 -

*Adams v. Committee* - Case No. 15:-cv-01046-YGR – Pl. Opp. Defendants' Motions to Dismiss

5 U.S.C. § 552(b) .................................................................................................................... - 15 -
5 U.S.C. § 552(d) .................................................................................................................... - 15 -
*5 U.S.C. § 702* ......................................................................................................................... - 4 -
U.S. Const. amend. I. ................................................................................................................. - 9 -

**Other Authorities**
H. Cross, The People's Right to Know 25 (1953); 66 Am.Jur.2d Records and Recording Laws s 15 (1973)........ - 18 -
Note, The Public Right of Access to Government Information Under the First Amendment, 51 Chi.Kent.L.Rev. 164, 169 (1974) ............................................................................................................................. - 18 -

**Rules**
RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY PROCEEDINGS 23(a) .......................... - 7 -

I.

*Adams v. Committee* - Case No. 15:-cv-01046-YGR – Pl. Opp. Defendants' Motions to Dismiss

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.      INTRODUCTION

Plaintiffs in their lawsuit seek disclosure of racist and sexist emails sent or received by Hon. Richard Cebull (ret.), the former Chief District Judge for the District of Montana.  It is undisputed that Plaintiffs requested these records from Defendants and that they were denied access to these emails pursuant to the exemption for the "courts of the United States" under the Freedom of Information Act (5 U.S.C. § 551(1)(B)) and pursuant to the confidentiality provisions of the Judicial Conduct and Disability Act (28 U.S.C. §360).  Plaintiffs seek these emails pursuant to their inherent right to court records as recognized by the common law and based on the statutory provisions that require disclosure of government records.  To the extent that Congress has exempted the Judiciary from any such requirements, such exemptions are unconstitutional abridgments of Plaintiffs' First Amendment rights.  To the extent that Defendants claim confidentiality, they ignore the fact that the emails at issue were not created in the course of any judicial investigation but rather are government documents created on a government computer by a government official using his government email account.  Any other government official would be required to produce such emails to a proper request for them.

The Government has failed to offer a compelling reason for the non-disclosure of the racists and sexist emails.  Judge Cebull no longer sits on the bench as he retired, and it is undisputed that the investigation is now concluded.  This does not, however, mean that there is no newsworthiness to the emails or those who received or replied to them.  And if there are officials who expressed similar racist or sexist views in response to Judge Cebull's emails, those views need to be exposed so the public can properly evaluate these officials' qualifications for office or positions of public trust.

Plaintiffs file a consolidated brief against both Defendants Catterson and the Committee for ease of reference for the Court.

## III.     STATEMENT OF FACTS

Plaintiff John Adams was the Capital Bureau Chief for the *Great Falls Tribune* when he received a copy of an email from Richard F. Cebull the Chief Judge of the Montana U.S. District Court on or about February 27, 2012.  (Compl. ¶8)  Judge Cebull's email contained a racist joke

about President Obama.  (*Id*.)  Mr. Adams spoke to Judge Cebull two days later, and the judge admitted to sending the email and using his Court-issued email address.  (Compl. ¶9)  Mr. Adams wrote a story about the Judge's racist email.  (Compl. ¶20)  It turns out that despite initially suggesting that there was only one racist email, Judge Cebull sent hundreds of racist and/or sexist emails.  (Compl. ¶13)

"Judge Cebull's forwarding of the email in question was widely reported in the local and national press. The ensuing notoriety was extensive, with calls for action—including demands that Judge Cebull resign—from members of Congress, governmental and non-governmental organizations, and members of the public." *In re Judicial Misconduct*, 751 F.3d 611, 613 (U.S. Jud. Conf. 2014).  Thousands of signatures were collected asking for Judge Cebull's resignation.  (*Id*.)  "Six professors at the University of Montana Law School published an editorial on March 14, 2012, writing that litigants before Judge Cebull 'now have clear reason to question his ability to be fair and impartial when they appear in his court.'"  (*Id*.)

Both Plaintiffs requested to receive copies of the racists and sexist emails, but Cathy Catterson acting in her official capacity on behalf of the Committee on Judicial Conduct and Disability denied the requests.  (Compl. ¶14)  Ms. Catterson, using Committee letterhead, denied the requests for the racist and sexist emails pursuant to 28 U.S.C. § 360 and 5 U.S.C. § 551(1)(B).  (Compl. ¶18)

## IV.  **LEGAL ARGUMENT**

### A.  <u>**This Court Has Jurisdiction to Hear the Instant Case**</u>

#### 1.  <u>**The Government Waived Sovereign Immunity with Respect to Requests for Documents Under FOIA**</u>

Plaintiffs sought the emails in question pursuant to their First Amendment rights and pursuant to the Freedom of Information Act (FOIA).  This point is uncontested in that Defendants specifically denied access to the racist and sexist emails based on the FOIA exemption for the "courts of the United States" under 5 U.S.C. § 551(1)(B).  (Compl. ¶18)  The Government's reliance on the FOIA exemption makes clear that Defendants understood

Plaintiffs to be requesting the emails pursuant to FOIA and that Defendants denied the request for documents at least in part on the FOIA exemption for the Judicial Branch.  Because FOIA was used as a basis for the request for documents and as the basis for denying the request for documents, the Court can look to FOIA for a waiver of sovereign immunity as to the type of request for documents that Plaintiff made.

FOIA makes clear that an aggrieved party may bring "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."  5 U.S.C. § 702.  Accordingly, there is a specific waiver of sovereign immunity to permit the instant lawsuit to proceed, and Defendants' request to dismiss on sovereign immunity grounds fails.

**2.   The Court's Inherent Authority to Engage in Judicial Review of Unconstitutional Laws  Gives the Court Power to Declare the Judicial Exemption Unconstitutional**

The early precedent of the United States Supreme Court make clear that the Courts of the United States are empowered to refuse to give effect to congressional legislation if it is inconsistent with the court's interpretation of the Constitution.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803).  Justice Marshall noted "that every right, when withheld, must have a remedy, and every injury its proper redress."  *Id*. at 147.  Fundamental to the operation of our government is the principle that "[a]n act of congress repugnant to the constitution cannot become a law."  *Id*. at 138.  "It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act."  *Id*. at 177.  As noted more recently in the debate over the Affordable Care Act, our current Supreme Court opined that "[o]ur respect for Congress's policy judgments thus can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579, 183 L. Ed. 2d 450 (2012).

Where, as here, Congress has acted in a way that exempts certain branches of government from the transparency afforded by the common law (See Sec. E, *infra*.) and permits such branches of government to abridge the First Amendment freedom of the press, the exemption must fail.  Because the Government does not even attempt to offer a compelling reason for the exemption for the judiciary when balanced against the infringement on the freedom of the press, the exemption must be struck down as offending the First Amendment.

### 3.  The JCD Committee Is Not Immune from Suit Because It Was Not Acting in a Judicial Role When it Rejected Plaintiffs' Request for the Emails and the Doctrine of Judicial Immunity Does Not Apply to the Facts Here

Defendant Committee relies on the doctrine of judicial immunity to claim that the judges who make of the committee are "absolutely immune from civil liability for damages for their judicial acts," citing *Mullis v. U.S. Bankr. Court*, 828 F.2d 1385, 1388 (9th Cir. 1987).  This argument fails for numerous reasons.

**First**, none of the judges are being sued in their individual capacities, therefore the principle of judicial immunity does not apply.  The mere fact that the members of the committee are judges does not mean that they were committing a judicial act when they denied access to Judge Cebull's emails.[1]

**Second**, whereas here, Plaintiffs seek to compel production of documents pursuant to a lawful request for them, the request does not implicate any judicial act or an act in furtherance of a judicial act.  Just as FOIA operates independently of the departments which are required to respond to FOIA requests, the requests at issue here were outside the scope of the Committee's

---

[1] Defendants seek to rely on several cases where members of a judicial council were found to be acting in a judicial capacity when engaging in activities of the council.  (Comm. MPA p.13:5-20.)  But these cases are all distinguished because they relate to the judges on the committee taking action against a judge accused of misconduct or actions relating to bar membership.  No such conduct is at issue here.  Non-judicial officials engage in FOIA activities all the time and they are not covered by any judicial immunity claim.  To the extent that Defendants rely on "qualified judicial immunity," this doctrine merely protects a defendant against monetary damages (*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982),  and Plaintiffs do not seek such damages here.

investigation.  The request here does not seek the investigation itself but rather requests the underlying emails that were created before the investigation was launched.  To the extent that they complaint is interpreted to ask for the investigation file itself, Plaintiff hereby stipulates that the requested documents only encompass the emails either sent or received by Judge Cebull.  Accordingly, judicial immunity does not apply.

**Third**, the doctrine of judicial immunity does not apply to ministerial acts that are not "judicial" in nature.  "The relevant cases demonstrate that the factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, *i. e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i. e.*, whether they dealt with the judge in his judicial capacity."  *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S. Ct. 1099, 1107, (1978).  In *Stump*, an Indiana judge approved the sterilization of a 15-year-old "somewhat retarded" female based on the petition of the girl's mother.  Id. at 351.  In suing the judge, the girl argued that the nature of the proceedings were not judicial in nature because the judge issued the order based on an ex parte petition without notice to the girl and that he signed the order the same day he received the petition.  In rejecting this argument and upholding judicial immunity, the Supreme Court reasoned that "[b]ecause Judge Stump performed the type of act normally performed only by judges and because he did so in his capacity as a Circuit Court Judge, we find no merit to respondents' argument that the informality with which he proceeded rendered his action nonjudicial and deprived him of his absolute immunity."  *Id*. at 362-362.

The instant case could not be farther from the facts in *Stump*.  There was no judicial act here.  There was a request for documents in a letter and then an email, and the denial was made via a letter on and an email.  The judges did not actually sign the letters, and there was never any order of the court issued.  Nothing that constituted a judicial act was ever performed in denying Plaintiffs access to the racist and sexist emails.

## 4.   **Catterson Is Not Immune in Her Official Capacity for Unconstitutional Acts or Acts That Are Not Judicial Acts But Ministerial**

Catterson bears the burden of establishing that she is entitled to absolute quasi-judicial immunity.  The Supreme Court of the United States has confirmed:

that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.  The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.  [The Court] has been quite sparing in [its] recognition of absolute immunity, and [has] refused to extend it any further than its justification would warrant.  *Burns v. Reed*, 500 U.S. 478, 486-487 (1991).

Catterson agrees that "[c]ourt personnel are entitled to absolute quasi-judicial immunity [only] when performing tasks that are an integral part of the judicial process."  Catterson Mot. 4 (internal citations omitted) (emphasis added).  But even the act of a judge is only covered if the "nature of the act itself is a 'judicial' one."  *Stump v. Sparkman*, 435 U.S. at 362..

Accordingly, court personnel are not entitled to absolute quasi-judicial immunity for the performance of administrative and nondiscretionary tasks.  See *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436-437 (1993) (denying court reporters absolute immunity as their duty to transcribe a record verbatim is non-discretionary and ministerial); *Malley v. Briggs*, 475 U.S. 335, 342 (1986) (denying law enforcement officer absolute immunity for conduct involved in applying for warrant).  Much like a court reporter, Catterson was not afforded discretion in her duty of disposing of the requests at issue here.  See Antoine, 508 U.S. at 436-37.  To the contrary, the plain language of § 360(a) leaves Catterson no discretion in the exercise of this statutory function.  The statute mandates that all investigation-related documentation "shall be confidential and shall not be disclosed by any person in any proceeding," with three narrow exceptions – none of which apply to Catterson.  28 U.S.C. § 360(a) (emphasis added); see also RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY PROCEEDINGS 23(a) (requiring that information regarding proceedings "must not be disclosed by any judge or employee of the judicial branch").

Moreover, the Supreme Court and the Ninth Circuit have long recognized that "sovereign immunity does not bar suit for specific relief against a government official . . . if the official commits an unconstitutional act because the 'statute or order conferring power upon the officer to take action is claimed to be unconstitutional.'"  *Al-Nashiri v. MacDonald*, 741 F.3d 1002, 1008 (9th Cir. 2013) (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90 (1949)) (internal modifications omitted); accord *Ex Parte Young*, 209 U.S. 123,

159 (1908) ("the use of the name of the state to enforce an unconstitutional act . . . is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity").  Plaintiffs in their complaint allege that in refusing to disclose the documents they requested, Defendants, including Catterson, engaged in an unconstitutional act by refusing to release the requested records.  As "an official enforcing an unconstitutional act," Catterson is thus "stripped of [her] official or representative character and is subjected in [her] person to the consequences of [her] individual conduct."  See *Doe v. Qi*, 349 F. Supp. 2d 1258, 1286 (N.D. Cal. 2004) (internal quotation marks omitted).

Catterson's denial of Plaintiffs' request for the records at issue is not an integral part of the judicial process.  Even if it were, by enforcing § 360(a) and Rule 23(a) in an unconstitutional manner, Catterson may not invoke sovereign immunity.  As such, she is not entitled to absolute quasi-judicial immunity.

### 5.  Plaintiffs' Injury Flows Directly from Catterson's Denial of Access to the Racist and Sexist Emails and Therefore They Have Standing

The injury at issue here is the denial of access to Judge Cebull's racist and sexist emails.  FOIA makes clear that the denial of access to documents to which you are otherwise entitled gives rise to a cause of action under FOIA.  Defendant Committee argues that the complaint is devoid of facts alleging that the Committee, as opposed to Ms. Catterson, denied any request because no allegation of a request to the committee was made.  (Comm. MPA 16:10-12).  The Complaint notes that Plaintiffs asked to see the emails. (Compl. ¶14).  The Complaint then contends that "Defendants" denied the requests.  (Compl. ¶14).  In using the plural formulation of defendant, Plaintiffs clearly were identifying the Committee as one of the defendants denying access to the emails.

To the extent that there is a pleading deficiency, the Court should at least permit Plaintiffs an opportunity to amend the complaint.  Through such amendments, Plaintiffs could clarify that their requests were made to the Committee and that the Committee through its agents including Ms. Catterson denied that request for documents.

### B.  Plaintiffs Have a First Amendment Right to the Racist and Sexist Emails

1

### 1.  __The Freedom of the Press Is Broad__

The First Amendment provides that "Congress shall make no law . . . abridging the freedom . . . of the press."  U.S. CONST. amend. I.  "Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution."  *De Jonge v. State of Oregon*, 299 U.S. 353, 364, 57 S. Ct. 255, 260, (1937).  The Supreme Court noted the importance of the First Amendment Freedom of the Press in the Pentagon Papers case where the paper had obtained sensitive documents about the Vietnam War and the government sought to impose a prior restraint as to further publication.  The Court stated that

> In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors. The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government. The press was protected so that it could bare the secrets of government and inform the people. Only a free and unrestrained press can effectively expose deception in government.

*New York Times Co. v. United States*, 403 U.S. 713, 717, 91 S. Ct. 2140, 2143 (1971).  James Madison, the architect of the First Amendment, noted the importance of the Freedom of the Press as follows:

> In every State, probably, in the Union, the press has exerted a freedom in canvassing the merits and measures of public men of every description which has not been confined to the strict limits of the common law. On this **632 footing the freedom of the press has stood; on this footing it yet stands. * * * Some degree of abuse is inseparable from the proper use of everything, and in no instance is this more true than in that of the press. It has accordingly been decided by the practice of the States, that it is better to leave a few of its noxious branches to their luxuriant growth, than, by pruning them away, to injure the vigour of those yielding the proper fruits."

*Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 718, 51 S. Ct. 625, 631-32 (1931).  Just six years after the Near decision, the Supreme Court noted that "[a] free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves."  *Grosjean v. Am. Press Co*., 297 U.S. 233, 250, 56 S. Ct. 444, 449, (1936). Even when the case involves judicial officers, the Supreme Court has held that "concern for the dignity and reputation of the courts does not justify the punishment as criminal contempt of criticism of the judge or his decision."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 272-73, 84 S. Ct. 710, 722 (1964) [libel case].

1

2

### 2.  **The Press, in Exercising Its' First Amendment Rights, Provides an Important Check on the Judiciary**

3

4

The Judiciary has always been subjected to the scrutiny of the Press.  The Supreme

Court has stated that the law gives "[j]udges as persons, or courts as institutions . . . no greater

immunity from criticism than other persons or institutions."  *Bridges v. California*, 314 U.S.

252, 289, 62 S.Ct. 190, 206, (1941) (Frankfurter, J., dissenting).  As the Supreme Court noted in

a case involving the publication of details about a disciplinary investigation into a state court

judge, "[t]he operations of the courts and the judicial conduct of judges are matters of utmost

public concern.."  *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 839, 98 S. Ct.

1535, 1541 (1978).  In that case, the *Virginian Pilot*, a newspaper owned by Defendant

Landmark, published an article identified a state judge who was the subject of a pending inquiry

by the Virginia Judicial Inquiry and Review Commission.  *Id*. at 831.  The state sought to rely

on a legislative finding that a "clear and present danger" existed by premature publication of

details of an inquiry, but the Supreme Court noted that "[d]eference to a legislative finding

cannot limit judicial inquiry when First Amendment rights are at stake."  *Id*. at 843.  The Court

held that despite some risk of injury to the judge and the system of justice, there was not a clear

and present danger to justify the criminal sanctions afforded by the statute.  *Id*. at 845.

Even in the *Sheppard* case involving prejudicial pre-trial publicity, the Supreme Court

noted that

> A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Sheppard v. Maxwell*, 384 U.S. 333, 350, 86 S. Ct. 1507, 1515 (1966).

Obviously, access to information is a key component to having the press act as a check

on the authority of government in general and more specifically the Judiciary.  Clearly the

FOIA exemption under 5 U.S.C. § 551(1)(B) "abridges" the First Amendment freedom of the

press because it is permitting Ms. Catterson and the Committee to refuse to produce the racist

and sexist emails.  But for that exemption, these emails would be discoverable under FOIA. Certainly, the complete exemption is not narrowly tailored to prevent disclosure of only certain types of documents such as Judges' notes or draft opinions or even the minutes of the informal meetings of the Supreme Court.  Instead, the blanket ban theoretically prevents any dis

### 3.  The First Amendment Prohibits Prior Restraints Against the Press

The Court has interpreted First Amendment guarantees to afford special protection against orders that prohibit the publication or broadcast of particular information or commentary orders that impose a "previous" or "prior" restraint on speech.  See *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 556, 96 S. Ct. 2791, 2801 (1976).  In *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 720, 51 S. Ct. 625, 632 (1931), the Court held invalid a Minnesota statute providing for the abatement as a public nuisance of any "malicious, scandalous and defamatory newspaper, magazine or other periodical." Near had published an occasional weekly newspaper described by the County Attorney's complaint as "largely devoted to malicious, scandalous and defamatory articles" concerning political and other public figures. 283 U.S., at 703. Publication was enjoined pursuant to the statute, and it was found that the content of the paper displayed anti-Semitism.  *Id*., at 723, 724-727, n. 1.  But the Court concluded that "[t]he fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint in dealing with official misconduct." *Near*, 283 U.S. at 720.

### 4.  Denying Access to Judge Cebull's Racist, Sexist Emails Constitutes a Prior Restraint

In the traditional sense, a prior restraint was preventing a newspaper from printing or distributing a story prior ot its publication or public dissemination.  In *New York Times v. United States*, *supra*, 403 U.S. 713, the government sought to block the continued publication of the Pentagon Papers after their initial publication in the paper.  The Supreme Court rejected the government's argument.

In the instant case, the Committee and presumably the Judiciary are the sole repository for the racist and sexist emails created and disseminated by Judge Cebull.  Although the general

content is understood from the reports issued by the Committee, the precise content is not known but for the email that Plaintiff Adams received.  But official government emails are typically discoverable pursuant to requests for information under FOIA, unless there is an legal exemption.  As Plaintiffs assert in this case, the broad exemption afforded the Judiciary is not narrowly tailored to the need to protect the rights of litigants or the deliberative process.  And in so doing, the withholding of the emails is undermining the faith in the Judiciary by not exposing the hateful content of the emails to the light of day or the pen of exposure.

## 5.  Defendants' Read *Houchins* and Similar Cases Too Broadly

Defendant cites to *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) for the principle that the Press do not enjoy a greater right to access to government records than the general public.  (Comm. MPA p.18:5-7)  But *Houchins* is distinguished based on the facts of the case and the competing constitutional interests at play in that case.  In *Houchins*, television reporters were seeking to gain access to a county to develop a story about conditions there that might have contributed to the suicide of one of the inmates.  The Court noted no generalized public right of access to government facilities and prisons in particular.  *Houchins*, 438 U.S. at 8-11.  The Court also noted the important role the press plays in keeping the public informed and checking the power of elected officials.  *Id*. at 7-8.  In denying the access, the Court deferred in part to the restrictions on access imposed by the jail to address privacy concerns of inmates and security concerns (*Id*. at 5) and reasoned that the press had no "special privilege of access which the Court rejected in *Pell* and *Saxbe*, a right which is not essential to guarantee the freedom to communicate or publish."  *Id*. at 12.  It is noteworthy that complete access to the jail was not denied as reporters and the public in general were permitted to view the jail during orchestrated tours.  *Id*. at 4-5.  In contrast here, there is no interest in keeping official government emails with racist or sexist content private, and the Government is not permitting even limited access to the underlying emails irrespective of the investigation file itself.  In addition, Plaintiffs have a substantial interest in publishing such emails to ensure that the Public's interest in an unbiased judiciary is protected.  Moreover, Plaintiffs do not even have to claim a special right to the racist

emails because presumably, the emails are discoverable under FOIA assuming the exemption for the courts of the United States is unconstitutional.

Defendants' reliance on *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1441 (9th Cir. 1996) is also without merit.  That case involved a challenge to the restrictions on the right to travel to Cuba, and the Court found that the First Amendment expressive or associational rights were not implicated there (*Id*. at 1441), but that was in part because there were exemptions under the statute for journalists qualified "for a general license partially exempting them from these restrictions" under the statute.  *Id*. at 1434.  When balanced against the original intent of our Founders in securing the freedom of the press and the need they saw for the press to check the power of government, these cases cannot stand for the principles cited.[2]

### 6.   <u>Judge Cebull's Act of Sending Racist Emails Is Not a Judicial Act</u>

The Government presumes that Judge Cebull's emails were somehow protected or confidential judicial records.  They are not.

The policy behind judicial immunity is less compelling when attempts are made to extend the scope of the protection to administrative acts.  Because judges are less free to delegate decisions to subordinates, the scope of absolute immunity should be limited.  The Supreme Court specifically recognized this problem when evaluating judges ability to hire and fire probations officers in Illinois or Virginia judges right to promulgate and enforce bar codes.  In both instances, the conduct of judges was determined to be outside the scope of judicial acts. *Forrester v. White*, 484 U.S. 219, 230, 108 S. Ct. 538, 545-46, (1988).  The Court noted that Supreme Court precedent "suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by

---

[2] Defendant also cites to *Zemel v. Rusk*, 381 U.S. 817, 834 (1974) for the principle that  the Constitution does not include a right to gather information.  This case was decided in the context of an individual seeking a tourist visa to travel to Cuba.  Defendants' citation to *Branzburg v. Hayes,* 408 U.S. 665, 684, 92 S. Ct. 2646, 2658, 33 L. Ed. 2d 626 (1972) (Comm. MPA pp.18-19) is also without merit.  <u>**First**</u>, the quote cited was attributed to the *Rusk* case, so it should be read in that context.  <u>**Second**</u>, *Branzburg* focused on whether or not a reporter could be compelled to reveal his or her sources or face contempt charges.  This case had nothing to do with whether or not a reporter should be able to access important government documents.

law to perform." *Id*. at 227.  For example, "[a]dministrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts." Id. at 228.  This helps explain why judicial immunity has not been extended to judges acting to promulgate a code of conduct for attorneys.  *Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719, 100 S.Ct. 1967, (1980) (Court reasoned that issuance of a Bar Code was not the act of adjudication but rather one of rulemaking).  For this reason, the *White* Court held that

> Judge White was acting in an administrative capacity when he demoted and discharged Forrester. Those acts—like many others involved in supervising court employees and overseeing the efficient operation of a court—may have been quite important in providing the necessary conditions of a sound adjudicative system. The decisions at issue, however, were not themselves judicial or adjudicative. As Judge Posner pointed out below, a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other Executive Branch official who is responsible for making such employment decisions. Such decisions, like personnel decisions made by judges, are often crucial to the efficient operation of public institutions (some of which are at least as important as the courts), yet no one suggests that they give rise to absolute immunity from liability in damages under § 1983.

*Forrester v. White*, 484 U.S. at 229.

## 7.   Shielding the Facts of Judge Cebull's Racist and Sexist Emails Would Contravene Notions of Due Process and an Unbiased Judiciary and Do Not Serve a Compelling Government Interest

The First Amendment to the Constitution requires that Congress not pass any law that "abridges" the freedom of the press.  The Fifth Amendment to the Constitution guarantees Due Process of the laws.  As noted in section B.4. supra, there simply is no compelling reason to shield Judge Cebull's racist and sexist emails from disclosure pursuant to FOIA or the generic freedom of the press to scrutinize government records.

## C.  FOIA Provides a Basis for Obtaining Judge Cebull's Racist and Sexist Emails

### 1.  FOIA Provides a Legal Basis for Obtaining Records from Government Agencies

Typically, emails of public officials are discoverable pursuant to the Freedom of Information Act.  For example, the Associate Press is currently suing the U.S. State Department

to obtain the email records of Hillary Rodham Clinton including those sent and received from her private email account.  See *Associated Press v. U.S. Department of State* (Case No. 15-cv-345) (D.D.C. March 11, 2015).

Under the plain language of the statute, FOIA makes available to any person all federal agency records, 5 U.S.C. § 552(a), with the exception of just nine specifically enumerated categories of records. 5 U.S.C. § 552(b). FOIA's provisions are clear and unambiguous that the nine exemptions are exclusive, and that documents must be made available "except as specifically stated." 5 U.S.C. § 552(d).  The Supreme Court has observed that Congress's intent in enacting FOIA was to "open agency action to the light of public scrutiny" *Department of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 772 (1989) (citation omitted)), and in so doing to "clos[e] the 'loopholes which allow agencies to deny legitimate information to the public.' "  *Department of Justice v. Tax Analysts*, 492 U.S. 136, 148, 150 (1989) (quoting *GTE Sylvania, Inc. v. Consumers Union of United States, Inc.*, 445 U.S. 375, 385 (1980)). The legislative history, moreover, evinces Congress' concern that section 3 of the APA, the precursor to FOIA, was full of "loopholes" to disclosure, which agencies used to "cover up embarrassing mistakes or irregularities." S. Rep. No. 813, 89th Cong., 1st Sess. 3 (1965); see also Freedom of Information Act Sourcebook, Legislative Materials, Cases, Articles, S. Doc. No. 93-82, 93d Cong., 2d Sess. 7 (1974). In addressing the nine specific exemptions from disclosure under the Act, this Court has stated that "these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Department of Air Force v. Rose*, 425 U.S. 352, 361 (1976). Thus, "[c]onsistent with the Act's goal of broad disclosure, these exemptions have been consistently given a narrow compass." *Tax Analysts*, 492 U.S. at 151.  But for the exemption for "the courts of the United States" (5 U.S.C.§ 551(1)(B), there is little doubt that the Judiciary and all of its arms and agencies would be subject to the disclosure requirements of public documents.

2.  **Plaintiff's Complaint Specifically Contends that the FOIA Exemption for the Judiciary Is Unconstitutional and Therefore Defendants'**

**Reliance on the Judicial Exemption to FOIA as the Basis for Denying**

**Access to Judge Cebull's Emails Was also Unconstitutional**

It is undisputed that Defendants rely specifically on an exception under FOIA for the "courts of the United States. (Compl. ¶18; 5 U.S.C. § 551(1)(B)) This exemption, however, directly conflicts with the Freedom of the Press to act as a check on the Judiciary in situations such as the one presented here where there are racist judges on the bench. "It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged [] by Congress …." *Red Lion Broad. Co. v. F.C.C.,* 395 U.S. 367, 390, 89 S. Ct. 1794, 1807, 23 L. Ed. 2d 371 (1969)

Were it not for the exemption for the Courts of the United States, it is clear that Ms. Catterson and the Committee would not have a legitimate basis for denying Plaintiffs' request for the emails.[3]  Plaintiffs seek to gather information about the extent of Judge Cebull's racist and sexist views and to see whether any other government officials shared or expressed support for those racist and sexist views.

The sexist and racist emails call into question a fundamental requirement for any jurist. The "integrity of the judiciary" is a somewhat vague concept, but it appears largely coextensive with the notion of "judicial impartiality." The "traditional" understanding of judicial impartiality, as this Court has explained, "is  the lack of bias for or against either party to the proceeding." *Republican Party of Minn. v. White (White I)*, 536 U.S. 765, 774 (2002). (emphasis omitted). "Impartiality in this sense assures equal application of the law" and "guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party." *Id.*  Preventing actual judicial bias is for those reasons a

---

[3] If Defendant argues in reply that Plaintiff has not alleged a separate action under FOIA, Plaintiffs contend that they do not have to because they filed an action for injunctive and declaratory relief pursuant to FOIA.  If the Court feels that such a cause of action is required, Plaintiffs respectfully request that the Court permit them leave to amend the complaint to add a separate cause of action for violation of FOIA.

compelling governmental interest. See *White I*, 536 U.S. at 793 (Kennedy, J., *concurring*) ("Judicial integrity is . . . a state interest of the highest order.").

   D. <u>**The Judicial Conduct and Disability Act Does Not Protect Emails Created**</u>
      <u>**Before the Investigation Started from Disclosure**</u>

   Throughout their papers, Defendants continually suggest that Judge Cebull's emails are part of the investigative file and therefore subject to protection from disclosure pursuant to the statutes that exempt investigative or deliberative conduct.  But the emails here are nothing of the sort.  They were created or received by Judge Cebull before any investigation was initiated.  They are unquestionably public documents because they were created on government computers using a government email account.  In short, there is nothing to make them confidential and subject protection from a FOIA request.

   The attorney-client privilege provides a useful analogy.  The Court has long-since recognized that the purpose of the attorney-client privilege is to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.  *Hunt v. Blackburn*, 128 U. S. 464, 470 (1888); *Trammel v. United States*, 445 U. S. 40, 51 (1980).  However, in upholding the importance of this privilege, the Courts have consistently recognized equally significant limitations, namely that a "party cannot conceal a fact merely by revealing it to his lawyer." *Diversified Industries Inc. v Meredith*., 572 F. 2d 596, 611 (8th Cir. 1977).

   Here, Plaintiffs seek access to the incoming and outgoing messages from Judge Cebull's government email account that supported the findings of the investigative report.  The mere fact that these emails were reviewed during the confidential investigation does not make the emails themselves confidential.  Analogous to the attorney-client privilege, these emails constitute the underlying facts of Judge Cebull's judicial misconduct.  Therefore, even if this Court determines that the specific communications of the JCD Committee during their investigation or the investigative report shall remain confidential, the emails should not be afforded this same privilege on the basis that they were turned over to the JCD during the course of their

investigation.  The emails existed prior to and independent of the JCD's investigation, and were not transmitted with any valid expectation of privacy or attorney-client privilege.

**E.**  **Plaintiffs Have a Common Law and Constitutional Right to Access Official Public Records of the United States District Court**

The emails at issue here are part of the official public records of the United States District Court. They were created on a government computer and sent using an official government email address.  *In re Judicial Misconduct*, 751 F.3d 611, 623 (U.S. Jud. Conf. 2014) The emails were originally sent to at least six different email recipients before they were received by Plaintiff Adams who was a reporter for the Great Falls Tribune.  *Id*.  "Judge Cebull sent hundreds of other inappropriate emails to court staff and individuals outside the court. The quantity and nature of these emails underscores the magnitude of Judge Cebull's breach of judicial ethics and the public trust."  *Id*.

The common law has long recognized a right to inspect and copy public records. In England, the right was narrowly circumscribed, and only a limited number of persons enjoyed it.[4] But the American courts tended to view any limitation as "repugnant to the spirit of our democratic institutions,"[5] and therefore granted all taxpayers and citizens access to public records.[6] It was the courts' view that "no sound reason (could be) advanced for depriving a citizen of his right; for it is evident that the exercise thereof . . . will serve as a check upon dishonest public officials, and will in many respects conduce to the betterment of the public service."[7]

---

[4] H. Cross, The People's Right to Know 25 (1953); 66 Am.Jur.2d Records and Recording Laws s 15 (1973).

[5] *Nowack v. Fuller*, 243 Mich. 200, 219 N.W. 749, 750 (1928).

[6] See, e.g., *State ex rel. Colescott v. King*, 154 Ind. 621, 57 N.E. 535 (1900); Nowack v. Fuller, supra note 16; *Fagan v. State Board of Assessors*, 80 N.J.L. 516, 77 A. 1023 (1910); *State ex rel. Wellford v. Williams*, 110 Tenn. 549, 75 S.W. 948 (1903); *Clement v. Graham*, 78 Vt. 290, 63 A. 146 (1906); *Payne v. Staunton*, 55 W.Va. 202, 46 S.E. 927 (1904). See also H. Cross, supra note 15, at 56; Project, Government Information and the Rights of Citizens, 75 Mich.L.Rev. 971, 1179 (1975); Note, The Public Right of Access to Government Information Under the First Amendment, 51 Chi.Kent.L.Rev. 164, 169 (1974).

[7] *State ex rel. Colescott v. King*, supra note 17, at 538.

1    Members of the public, under common law as well as federal statute, have an affirmative

2  right of access to court records. This precious right has its roots in English law, where tenants of

3  a manor could always inspect the court rolls and books of the manor to ascertain their titles, *Rex

4  v. Shelley*, 3 Term R. 141, and where citizens could inspect the books and papers of a borough

5  to determine the limits of a mayor's authority, *Rex v. Babb*, 3 Term R. 579.  As early as 1635,

6  Lord Coke observed with respect to court records:  "These records, for that they contain great

7  and hidden treasure, are faithfully and safely kept (as they well deserve) in the King's Treasury.

8  And yet not so kept but that any subject may for his necessary use and benefit have access

9  thereunto, which was the ancient law of England, and so is declared by an act of Parliament in

10  46 E 3."

11    The public's common law right of access to court records is fully recognized by U.S.

12  Courts dating back at least to 1894.  *Ex parte Drawbaugh*, 2 App.D.C. 404 (1984) (rejecting an

13  appellant's attempt to seal the records in his appeal)..  In  *In Ex parte Drawbaugh*, the Court of

14  Appeals, quoting Professor Greenleaf's treatise on Evidence, stated:

> "'It has been admitted, from a very early period, that the inspection and exemplification
> of the records of the King's courts is the common right of the subject .... [A]ny limitation
> of the right to a copy of a judicial record or paper, when applied for by any person
> having an interest in it, would probably be deemed repugnant to the genius of American
> institutions.' ... [A]nd any attempt to maintain secrecy, as to the records of the court,
> would seem to be inconsistent with the common understanding of what belongs to a
> public court of record, to which all persons have the right of access, and to its records,
> according to long established usage and practice."
> 2 App. D.C. at 406-408 (emphasis in original).

20    Already deeply entrenched in the common law, the right of the public to inspect and

21  copy court records draws further strength from statutory authority. The maintenance of public

22  court records is provided for by 28 U.S.C. § 753(b), and the right of public inspection and

23  copying of court records has been reinforced by directives of the Judicial Conference issued

24  under 28 U.S.C. § 457.

25    The U.S. Supreme Court has frequently recognized that the public policy of the United

26  States strongly favors public knowledge of legal proceedings in courts of record and

27  dissemination of court records by the press. See, e.g., *Cox Broadcasting Corp. v. Cohn*, 420

28  U.S. 469, 491-496 (1975); *Sheppard v. Maxwell*, 384 U.S. 333, 349-350 (1966). As the Court

pointed out in *Estes v. Texas*, 381 U.S. 532, 542 (1965), quoting Judge Cooley, "The law ... favors publicity in legal proceedings, so far as that object can be attained without injustice to the persons immediately concerned."

## V.   CONCLUSION

Defendants motion to dismiss must be denied because Defendants have failed to establish why the burden on Plaintiffs' First Amendment rights are overcome by a compelling government need to protect a ministerial act.  In addition, if Plaintiffs are right and the FOIA exemption is unconstitutional or unconstitutionally overbroad, the Court must strike that provision down as requested in Plaintiffs' complaint.

Respectfully submitted,

DATED: July 6, 2015                    **CALIFORNIA CIVIL RIGHTS LAW GROUP**

/s/ Lawrence A. Organ
Lawrence A. Organ, Esq.
Attorneys for Plaintiffs