1  LAWRENCE A. ORGAN (SBN 175503)
2  JULIANNE K. SCHWARZ (SBN 290001)
   NICOLE C. MOSKOWITZ (SBN 298431)
3  **CALIFORNIA CIVIL RIGHTS LAW GROUP**
4  407 San Anselmo Avenue, Suite 201
   San Anselmo, CA 94960
5  Telephone:   (415) 453-4740
6  Facsimile:   (415) 785-7352
   larry@civilrightsca.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ADAMS, SHANE CASTLE on behalf of themselves and all others similarly situated,<br><br>　　　　　Plaintiffs,<br>　　v.<br>COMMITTEE ON JUDICIAL CONDUCT AND DISABILITY OF THE JUDICIAL CONFERENCE OF THE UNITED STATES; and CATHY A. CATTERSON in her official capacity as Circuit and Court of Appeals Executive to the U.S. Courts for the Ninth Circuit.<br>　　　　　Defendants.<br>_____ | Case No.: 15-cv-01046-YGR<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING DEFENDANTS' MOTIONS TO DISMISS**<br><br>Hearing Date: July 28, 2015<br>Time: 2:00 p.m.<br>Courtroom 1, 4th Floor<br><br>Hon. Yvonne Gonzalez Rogers |

## I. INTRODUCTION

Press access to records of the Judiciary has historically been very broad. The trend has been to extend the common law right of access relying on Constitutional First Amendment principles. Even if the Court were to look at precedent narrowly in the context of judicial misconduct proceedings, the disciplinary proceedings against Judge Richard Cebull were sufficiently trial-like and adversarial such that the First Amendment's right of access to court records applies. In addition, the documents at issue here are not actually part of the investigatory file but rather predate the investigation and merely form the factual basis for the complaint, so any alleged interest the Government might assert in protecting the integrity of the "investigation file" simply does not extend to the factual underpinnings of the racist and sexist conduct that formed the basis for the investigation. Since the Government has failed to offer a compelling reason for the non-disclosure of the racist and sexist emails, this Court should deny the motion to dismiss and permit this case to move forward.

The Complaint adequately pleads a cause of action under the First Amendment. The First Count specifically states that it is brought pursuant to the First Amendment. Plaintiffs are both members of the press corps. Defendants, the Committee and Catterson in her official capacity, are in control of the requested emails which form the factual basis for the disciplinary proceedings. Accordingly, this Court should permit this case to move forward on the merits.

## II. STATEMENT OF FACTS

Plaintiffs are members of the press. (Compl. ¶¶4, 5, 8) Based on the complaints and reports of the Committee, it is apparent that the Committee and/or Catterson have copies of Judge Cebull's racist and sexist emails. (Compl. ¶¶10, 13) Plaintiffs asked for copies of the emails from Defendants and their requests were denied. (Compl. ¶¶14, 18) Plaintiffs' complaint alleges a cause of action for violation of the First Amendment Freedom of the Press. (Compl. ¶¶22, 26) Accordingly, Plaintiffs have satisfied any pleading requirement to obtain the emails in question.

## III. LEGAL ARGUMENT

### A. The First Amendment Empowers the Public to Exercise Its Sovereignty Over Public Institutions Including the Judiciary

"[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).  Its central meaning is to preserve the right of free discussion of the stewardship of public officials (*New York Times Co. v. Sullivan*, 376 U.S. 254, 275 [1964]), which is "the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). There is a "paramount public interest in a free flow of information to the people" concerning judges and judicial administration, an interest secured by the ability of the public and press to attend trials and thereafter to disseminate reports concerning them. *Garrison v. Louisiana*, *supra*, 379 U.S. at 77.

The press plays a particularly important role with respect to judicial proceedings. It enlightens the public by "report[ing] fully and accurately the proceedings of government." It simultaneously performs the corrective function of "bring[ing] to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975).

Press reports of judges and judicial proceedings are extremely close to the "core of the First Amendment" and "clearly serve [ ] those interests in public scrutiny and discussion of governmental affairs which the First Amendment was adopted to protect." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838, 98 S. Ct. 1535, 1541 (1978).  In rejecting the State of Virginia's criminal penalties for reporters revealing the content of proceedings before a state judicial review commission, the Court noted that neither judges' reputations nor maintaining institutional integrity were sufficient justifications to support infringing on the First Amendment.  *Id*. at 841.  In addition, the Court opined that legislative findings were not a sufficient basis by which to limit First Amendment rights. *Id*. at 843.   In the context of a prior restraint case involving evidence from a murder trial, Justice Brennan in the *Nebraska Press Ass'n* case noted that:

> "[t]he press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism. [Citations] Commentary and reporting on the criminal justice system is at the core of First Amendment values, for the operation and integrity of that system is of crucial import to citizens concerned with the administration of government. Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges; free and robust reporting, criticism, and debate can contribute to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system, as well as improve the quality of that system by subjecting it to the cleansing effects of exposure and public accountability."
> *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 586-87, 96 S. Ct. 2791, 2816, 49 L. Ed. 2d 683 (1976) (Brennan, J. concurring).

Following the *Landmark Communications* case, the Supreme Court subsequently struck down a Florida ban on witnesses to a grand jury ever disclosing the facts to which they testified. The Court held that a Florida statute prohibiting witness from ever disclosing testimony given before a grand jury violates the First Amendment insofar as it prohibits a witness from disclosing his own testimony after the grand jury's term had ended. *Butterworth v. Smith*, 494 U.S. 624, 110 S. Ct. 1376, 108 L. Ed. 2d 572 (1990). *Butterworth* is particularly helpful here because it dealt with factual information in a proceeding that had already been concluded.

"By reporting about the government, the media are "surrogates for the public." *Richmond Newspapers,* 448 U.S. at 573, 100 S.Ct. 2814 (Burger, C.J., announcing judgment); *see also Cox Broad. Corp. v. Cohn,* 420 U.S. 469, 490–91, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."). When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate. *See* Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment,* 44 Stan. L. Rev.. 927, 949 (1992)." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).

As noted by this Court in its October 29 Order, the First Amendment right of access has been extended from the context of criminal trials to "civil proceedings and associated records and documents." (Doc. 36, p.2:10—11, *citing Courthouse News Serv. v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014)); *see also N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.* ("*NYCTA* "), 684 F.3d 286, 298 (2d Cir.2012). In so holding, the Second Circuit noted that the First

Amendment "does not distinguish between criminal and civil proceedings," but rather "protects the public against the government's arbitrary interference with access to important information." *Id.* Based on this logic, the Second Circuit held that the First Amendment right applies, among other things, to summary judgment motions and documents relied upon in adjudicating them, *Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110, 124 (2d Cir.2006), pretrial motions and written documents submitted in connection with them, *In re New York Times Co.,* 828 F.2d 110, 114 (2d Cir.1987), and docket sheets, *Hartford Courant Co. v. Pellegrino,* 380 F.3d 83, 93 (2d Cir.2004). This access also includes preliminary matters such as plea and sentencing hearings. *In re Washington Post Co.*, 807 F.2d 383 (4th Cir. 1986) [Classified Information Procedures Act did not justify closure of hearings in connection with criminal espionage charges].

The proper inquiry, then, is not whether or not the judicial misconduct processes have been traditionally open to the press but rather whether emails from a public email account and sent on a public computer are subject to press scrutiny. It is in this historical context of the Press acting as a check on the power of the judiciary to ensure the impartiality of judicial officers that the instant case must be evaluated.

### B. **Plaintiffs Satisfy the Press-Enterprise II Experience and Logic Test and Have a First Amendment Right to the Racist and Sexist Emails Created as Part of Judge Cebull's Official Records**

In Press-Enterprise II, the Supreme Court has instructed that the following two questions should be asked to determine whether the First Amendment right of access applies to a particular proceeding: (1) "whether the place and process have historically been open to the press and general public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise Co. v. Superior Court,* 478 U.S. 1, 8, 106 S.Ct. 2735 (1986) (*Press–Enterprise II*). This test is commonly referred to as the "experience and logic test." *See, e.g., id.* at 9. The "experience and logic" approach applies to both judicial proceedings *and* documents, and asks "both whether the documents have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question." *Lugosch,*

*supra*, 435 F.3d at 120 (internal quotation marks omitted). The same test applies to the disclosure of "*documents* generated as part of a judicial proceeding." *Times Mirror Co. v. U.S.*, 873 F.2d 1210, 1213 n. 4 (9th Cir. 1989).

### 1. The Press Has Enjoyed a Long-Standing Right to Judicial Records

The Supreme Court has recognized that the public has a right, founded in the common law, "to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978) (emphasis added). As noted in Plaintiffs' Opposition Brief, this right dates back at least to the 17th Century in 1635 under the English Common Law and was evidenced in American legal precedent in the 19th Century as early as 1894. (See Pl. Opp. pp. 17-19)

Although access to judicial records "is not absolute," there is only a "narrow range of documents" not subject to public access based on the principle that such records have "traditionally been kept secret for important policy reasons." *Times Mirror Co. v. United States*, 873 F.2d 1210, 1219 (9th Cir.1989). These traditionally "secret" records fall into two categories of documents: grand jury transcripts and warrant materials in the midst of a pre-indictment investigation. *Id*. Unless a particular court record is one "traditionally kept secret," a "strong presumption in favor of access" is the starting point. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). The party seeking to deny access to documents must establish a compelling reason for doing so. *Id*.

The mere that that a process was historically private is not dispositive. In a follow up to *Press-Enterprise II*, the U.S. Supreme Court found that Puerto Rico's private preliminary injunction process violated the First Amendment when challenged even though it had historically been private. *El Vocero de Puerto Rico (Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147, 149-50, 113 S. Ct. 2004, 2005-06, 124 L. Ed. 2d 60 (1993). It sufficiently resembled a trial-like process that disclosure to the press was warranted under *Richmond Newspapers* and its progeny.

### 2. Defendants Incorrectly Focus on the Judicial Misconduct Proceedings Themselves Rather Than the Documents to Which Plaintiffs Seek Access

Defendants' Motion focuses almost entirely on the judicial misconduct proceedings and the statutory scheme under which the Committee investigated Judge Cebull. However, the documents at issue in this case are merely ancillary to the proceedings. They form the factual basis for the complaint against Judge Cebull and the ensuing conclusion that he had acted inappropriately for a judge, but there were not actually a product of the investigation. The emails were not created by the Committee but were merely acquired as part of the investigation. As noted above, this type of information has been traditionally and more recently open to access by the Press and the Public. Accordingly, any analysis by Defendants that the investigatory process is confidential or warrants protection is inapposite since the documents at issue here were not created as part of the judicial misconduct proceedings.

### 3. Even if the Court Analyzes the Evidence as Being Part of the Judicial Misconduct Proceedings, The First Amendment Requires Defendants to Provide Access

There is authority for permitting access to non-traditional judicial proceedings. For example, the Second Circuit extended the right of access to the New York City Transit Authority's civil citation proceedings. *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 289 (2d Cir. 2012). The court reasoned that the processes were similar in nature to more traditional judicial proceedings in that the alleged violators appeared before a neutral fact finder and the Commission acted as the prosecution gathering evidence in support of the complaint or citation. *Id.*

In fact, there can be no compelling reason to deny access to records that establish that a member of the judiciary failed to meet his Constitutional obligations to faithfully execute the laws of this nation in an impartial and unbiased manner.

### C. The Public Interest In Judicial Misconduct Is of Tantamount Importance

The purpose of the federal judicial misconduct scheme is to protect the public and to ensure that the Judiciary is unbiased and able to carry out its mandate of affording equal justice under the law. At the state level, this justification is noted by the California Supreme Court: "In

making our independent determination of the appropriate disciplinary sanction, we consider the purpose of a Commission disciplinary proceeding—which is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system. [citation]." *Broadman v. Comm'n on Judicial Performance*, 18 Cal. 4th 1079, 1111-12 (1998), as modified (Sept. 2, 1998).   The California Supreme Court has noted that "[t]he California Constitution, however, now expressly authorizes the Commission to provide public access to judicial disciplinary proceedings under appropriate circumstances."  *Adams v. Comm'n on Judicial Performance*, 8 Cal. 4th 630, 649, 882 P.2d 358, 369 (1994)

These same principles apply at the federal level, and in fact are magnified.  Unlike the state system where judicial officers face regular elections and are therefore subject to the check of the ballot box, Article III judges have life tenure.  Ensuring that federal judicial officers are unbiased is of tantamount importance because otherwise there are no checks on them and the public could lose confidence in a judiciary infected with biased or racist judges.  Logic therefore mandates that Plaintiffs be given access to the racist and sexist emails within the possession of Defendants Committee and Catterson.

## IV.     CONCLUSION

Defendants have copies of Judge Cebull's racist and sexist emails.  Plaintiffs have a common law and Constitutional right to access these documents.  This right is longstanding and important to ensure the integrity of the Judiciary.  Accordingly, this Court should deny the Motions to Dismiss and permit this lawsuit to proceed on the merits.

Respectfully submitted,

DATED: November 16, 2015            **CALIFORNIA CIVIL RIGHTS LAW GROUP**

/s/ Lawrence A. Organ
Lawrence A. Organ, Esq.
Attorneys for Plaintiffs